**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

|                                     |     |                              |
| ----------------------------------- | --- | ---------------------------- |
|                                     | :   |                              |
| **DEBORAH PHILLIS,**                | :   |                              |
| **Plaintiff,**                      | :   | **Civil Action No. 1:07-cv-1728** |
|                                     | :   |                              |
| **v.**                              | :   | **(Chief Judge Kane)**       |
|                                     | :   |                              |
| **HARRISBURG SCHOOL DISTRICT,**     | :   |                              |
| **et al.,**                         | :   |                              |
| **Defendants.**                     | :   |                              |

**MEMORANDUM**

Pending before the Court is Defendants Harrisburg School District and Cheryl Bankus'

motion for summary judgment.[1] (Doc. No. 36.)  The motion has been fully briefed and is ripe for

disposition.  For the reasons that follow, the motion will be granted.

**I.     BACKGROUND**[2]

On August 6, 2001, Plaintiff Deborah Phillis applied for a teaching position at Defendant

Harrisburg School District ("HSD"). (Doc. No. 38 ¶ 18.)  On December 6, 2001, Plaintiff was

notified of her appointment as a temporary professional employee of HSD. (Id. ¶ 19.)  In

September 2004, Plaintiff was assigned to HSD's high school as a learning support teacher. (Id.

¶ 20.)

Plaintiff taught in the basement of the school, in an area where other teachers taught and

where Defendant Cheryl Bankus, Plaintiff's supervisor and the assistant principal of Harrisburg

---

[1] Evangeline Kimber was also listed as a party on the summary judgment motion.
However, Ms. Kimber was dismissed by this Court's June 23, 2009 order. (Doc. No. 53.)

[2] In accordance with the standard of review on a motion for summary judgment, the
Court will consider all evidence in the light most favorable to Plaintiff.

High School, was also stationed. (Id. ¶¶ 28, 59.)  Bankus once made the comment that Plaintiff's room had a "musty butt smell." (Doc. No. 46 ¶ 60.)

According to HSD policy, non-tenured teachers are evaluated at least twice per school year and tenured teachers are evaluated at least once per school year. (Doc. No. 38 ¶ 22.)  On June 7, 2005, Plaintiff received an "unsatisfactory" rating on her teaching evaluation from Bankus. (Id. ¶¶ 27, 28.)  The unsatisfactory rating was later withdrawn by HSD.  HSD maintains that the rating was valid, but that it was withdrawn for certain procedural deficiencies. (Id. ¶ 32.)

On June 24, 2005, Plaintiff filed a grievance against HSD pursuant to her union's collective bargaining agreement. (Id. ¶ 35.)  Plaintiff filed subsequent grievances against HSD through her union, the Harrisburg Education Association, in October 2005, February 2006, and April 2006. (Id. ¶¶ 6, 46, 83.)

On July 26, 2005, Plaintiff filed a complaint with the Pennsylvania Human Relations Commission ("PHRC"). (Id. ¶ 36.)  She filed subsequent complaints alleging age discrimination and illegal retaliation with the PHRC in November 2005, February 2006, July 2006, and October 2006. (Id. ¶¶ 47, 64, 67, 69.)  The PHRC found no probable cause as to Plaintiff's claims. (Id. ¶ 5.)

Plaintiff filed complaints with the EEOC in June 2005, October 2005, February 2006, June 2006, and December 2006. (Doc. Nos. 1 ¶ 28; 38 ¶¶ 3-4.) The first complaint alleged age discrimination; all four subsequent complaints alleged age discrimination and illegal retaliation by HSD. (Doc. Nos. 1 ¶ 28; 38 ¶¶ 3-4.)

On October 3, 2005, HSD prepared an Individual Teacher Improvement Plan ("ITIP") for Plaintiff. (Doc. No. 38 ¶ 38.)  It is HSD's stated policy that ITIPS are not imposed to punish

teachers, but to help them improve their teaching skills. (Id. ¶ 72.) The ITIP cited several areas of concern regarding Plaintiff, including her "classroom management techniques, teacher interaction with students, and compliance with district regulations and policies." (Id. ¶ 39.) Plaintiff contends that the ITIP was done in retaliation for her filing a PHRC complaint. (Doc. No. 46 ¶ 39.) The ITIP was provided to Plaintiff on October 3, 2005, during a meeting with Bankus, Evangeline Kimber, and Maria McGlosson, a teacher's union representative. (Doc. No. 38 ¶¶ 44-45.) As a result of the ITIP, Plaintiff filed the second grievance with her union on October 16, 2005, and her second complaint with the PHRC on November 10, 2005. (Id. ¶¶ 46-47).

On February 3, 2006, Bankus conducted a formal classroom observation of Plaintiff. (Id. ¶ 49.) On February 6, 2006, Plaintiff received a rating of "unsatisfactory" on the Temporary Professional Employee/Professional Employee Rating Form. (Id. ¶ 52.) As before, Plaintiff contends that the rating was in retaliation. (Doc. No. 46 ¶ 52.) On February 15, 2006, Plaintiff filed her third grievance pursuant to the collective bargaining agreement. (Doc. No. 38 ¶ 63.)

In April 2006, Plaintiff received a letter of reprimand for placing her class rules on a table instead of posting them on the wall. (Id. ¶ 81-82.) Plaintiff filed a grievance challenging the reprimand, but the grievance was not upheld. (Id. ¶ 83.)

In approximately June 2006, HSD administration officials began to review Plaintiff's employment file regarding what it contends was a discrepancy in Plaintiff's prior employment and criminal history. (Id. ¶¶ 87-99.) On June 14, 2006, while HSD was investigating these alleged inconsistencies, Plaintiff applied to receive disability retirement benefits from the Public School Employees' Retirement System ("PSERS"). (Id. ¶ 108.) As the result of the alleged false

statements on her employment application, and alleged lack of cooperation with administrators, Mark Holman, HSD's director of human resources, recommended to the HSD Superintendent that Plaintiff be terminated. (Id. ¶ 109.)  The decision to begin termination proceedings is initially made by the Superintendent and then reviewed by the Board, whose chairperson executes the termination notice. (Id. ¶ 111.)

On July 27, 2006, HSD sent Plaintiff a letter regarding her hearing rights as to the termination. (Id. ¶ 115.)  The letter informed Plaintiff that a hearing would be conducted on August 11, 2006, for "the purpose of determining whether [Plaintiff] should be dismissed from [her] employment with the school district." (Doc. No. 39, Ex. 40.)  In addition, the letter informed Plaintiff of the charges against her:

> You are charged by the school district administration with immorality, persistent negligence in the performance of duties, willful neglect of duties, and persistent and willful violation of or failure to comply with school laws of this Commonwealth including official directives and established policy of the board of control and or school directors as contemplated by the School Code of 1949 as amended, growing out of your alleged commission of the following:
>
> Inaccuracies in your employment application that were recently discovered; refusal to comply with directives of your supervisor and failing to comply with provision of your plan for improvement as evidenced by numerous directives and an unsatisfactory rating during the 2005-06 school year.

(Id.)  On August 25, 2006, Plaintiff was suspended without pay. (Doc. No. 47 at 7.)  Plaintiff's request for disability retirement benefits was approved by PSERS on September 12, 2006. (Doc. No. 38 ¶ 116.)

### A.     June 25, 2007 Settlement

On June 25, 2007, following lengthy negotiations with regard to certain grievances,

Plaintiff and HSD entered into a Settlement Agreement and Release ("Settlement"). (Doc. No. 38 ¶ 7.)  The Settlement stated that it would not constitute an admission by either party in any subsequent proceeding. (Doc. No. 39, Ex. 14 ¶ 4.)  Plaintiff agreed to waive any rights to reinstatement in the event suit was brought pursuant to the charges before the PHRC. (Doc. No. 39, Ex. 14 ¶ 3.)

Pursuant to the Settlement, Plaintiff agreed to release HSD and its employees from "any and all liability" arising from Plaintiff's employment with HSD:

> Release by Employee. . . . Employee, and all other persons or entities claiming with, by, or through her, hereby releases and forever discharges District, and its board members, directors, officers, agents, employees and attorneys, and all other persons or entities who could be said to be jointly or severally liable with it, (individually and collectively "the Releasees") from any and all liabilities, claims, actions, causes of action or suits presently asserted or not asserted, accrued or unaccrued, known or unknown, that Employee had, now has, or may have or could claim to have against them, from the beginning of time to the date of execution of this Agreement, including, but not limited to all claims and rights in any way arising or based upon Employee's employment with District . . . .

(Doc. No. 39, Ex. 14 ¶ 3.)  However, the Settlement allowed for an exception for claims brought against HSD.  Specifically, Plaintiff's actions then pending before the PHRC and EEOC against HSD and "any subsequent action in State or Federal Court arising therefrom" were not released.[3]

---

[3]  Specifically, the exception to the release stated:

> Provided however that the contrary notwithstanding, nothing in this Agreement will serve to release the pending actions against the District listed below before the Pennsylvania Human Relations Commission, and Equal Employment Opportunity Commission and any subsequent action in State or Federal Court arising therefrom, insofar as they seek relief other than reinstatement[.]

(Doc. No. 39, Ex. 14 ¶ 3.)

(Id.)  The Settlement listed the five cases that were then pending before the PHRC and the EEOC. (Id.)

> **B.     September 21, 2007 Complaint**

Plaintiff filed her complaint instituting the basis of the present lawsuit before this Court on September 21, 2007. (Doc. No. 1.)  In it, Plaintiff alleges that Defendants retaliated against her because of her previous five complaints to the PHRC and the EEOC.   Specifically, Plaintiff avers four different counts against the Defendants. (Id. ¶¶ 10-13.)  First, Plaintiff alleges that Defendants violated her First Amendment "right to petition for a redress of grievances without suffering retaliation therefore." (Id. ¶ 10.)  Second, Plaintiff alleges violations of her rights under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. (Id. ¶ 11.) Third, Plaintiff alleges violations of her rights under Title VII, 42 U.S.C. § 2000e et seq. (Id. ¶ 12.) Finally, Plaintiff alleges a violation of her rights to equal protection under the Fourteenth Amendment. (Id. ¶ 13.)

## II.     SUMMARY JUDGMENT STANDARD

Defendants have moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, which provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient

evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249-50. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id. at 252; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

## III. DISCUSSION

### A. Claims against Defendant Bankus

Citing the June 25, 2007 Settlement signed by Plaintiff, Cheryl Bankus has moved for summary judgment as to the claims against her.

"It is well-established that a release is the giving up or the abandoning of a claim or right to the person against whom the claim exists or the right is to be enforced or exercised . . . ." Complaint of Bankers Trust Co., 752 F.2d 874, 883 (3d Cir. 1984). "The enforceability or validity of such settlement agreements is determined by federal law where the substantive rights and liabilities of the parties derive from federal law." Id. (citation omitted). However, even when a matter is premised on a federal cause of action, state law may govern the applicability of a release to those causes of action. See Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d 885, 891-92 (3d Cir. 1975); Pocopson Indus., Inc. v. Hudson United Bank, No. 05-6173, 2006 WL 2092578, at *8 (E.D. Pa. July 26, 2006) (noting that district courts in the Third Circuit have applied Three Rivers beyond the context of releases of federal antitrust claims and "have held that releases of all federal claims should be interpreted in accordance with state law where the factors discussed in Three Rivers are satisfied"). In Three Rivers, the Third Circuit set out a framework for courts in determining whether a contractual release should be interpreted by state law or by federal common law:

> Since Congress has not enacted a federal law for interpreting antitrust releases nor has it indicated an intent to adopt state laws on the subject, this court must consider for itself whether the statutory policies embodied in the antitrust laws will be better promoted by the absorption of state laws regarding release or the formulation of a federal rule. Factors relevant to the balancing of these competing governmental interests include: the need for a uniform federal rule, the extent to which the transaction in question fits within the normal course of activities regularly governed by state law, and the possibility of the state rule frustrating the operation of the federal statutory scheme.

Three Rivers, 522 F.2d at 889-90 (footnotes omitted). In this particular case, the Court finds that the factors weigh in favor of interpreting the release under state law, particularly in the present

case where the parties' agreement includes a choice of law provision. See Huber v. Taylor, 469 F.3d 67, 80 (3d Cir. 2006) (noting that the Third Circuit will generally enforce choice of law clauses) (citing Assicurazioni Generali, S.P.A. v. Clover, 195 F.3d 161, 164 (3d Cir. 1999)); see also Three Rivers, 522 F.2d at 891 ("The application of state law to the interpretation of a contract will not come as a surprise to the contracting parties."). The Settlement signed by Plaintiff includes a choice of law provision which states that the agreement "shall be governed by, construed under, and enforced pursuant to the laws of the Commonwealth of Pennsylvania." (Doc. No. 39, Ex. 14 ¶ 14.)

"Under Pennsylvania law, '[t]he effect of a release is determined by the ordinary meaning of the language contained therein.'" Glass v. City of Philadelphia, 455 F. Supp. 2d 302, 338 (E.D. Pa. 2006) (quoting Buttermore v. Aliquippa Hosp., 561 A.2d 733, 735 (Pa. 1989)). As the Pennsylvania Supreme Court has explained:

> Parties with possible claims may settle their differences upon such terms as are suitable to them. They may agree for reasons of their own that they will not sue each other, or anyone else, for the event in question. When the parties to a release agree not to sue each other or anyone else for a given event, this can effect a discharge of others who have not contributed consideration for the release. This is true even if the language of the release is general, releasing, for example, "any and all other persons" rather than specifically naming the persons released. However improvident the release may be or subsequently prove to be for either party, their agreement, absent fraud, accident or mutual mistake, is the law of their case. If such a release can be nullified or circumvented, then every written release and every written agreement of any kind, no matter how clear and pertinent, can be set aside whenever one of the parties changes its mind or the injured party receives an inadequate settlement.

Taylor v. Solberg, 778 A.2d 664, 667-68 (Pa. 2001) (citations omitted).

The Court finds the language in the Settlement unambiguously released any and all

claims that Plaintiff would have had against Bankus. Specifically, Plaintiff agreed to release

> [HSD], and its board members, directors, officers, agents, employees
> and attorneys . . . from any and all . . . claims . . . presently asserted
> or not asserted, accrued or unaccrued, known or unknown, that
> [Plaintiff] had, now has, or may have or could claim to have against
> them, from the beginning of time to the date of execution of this
> Agreement, including, but not limited to all claims and rights in any
> way arising from or based upon [Plaintiff's] employment with
> [HSD][.]

(Doc. No. 39, Ex. 14 ¶ 3.) Therefore, according to the plain language of the Settlement, all

claims Plaintiff "had, now has, or may have" against Bankus were released. Plaintiff has

presented no evidence or legal precedent to show why the Settlement should not be enforced. As

a result, Plaintiff's claims are precluded against Bankus and will be dismissed.

### B. Claims against Defendant HSD

Four claims are alleged by Plaintiff against HSD: (1) a First Amendment retaliation

claim; (2) an ADEA claim; (3) a Title VII claim; and (4) a Fourteenth Amendment equal

protection claim.[4]

HSD argues that, with the exception of Plaintiff's ADEA claims, Plaintiff's claims are

barred because they extend beyond the scope of the five PHRC complaints referenced in the

---

[4] Plaintiff also asserts in her Complaint that she makes supplemental state claims under
the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. ("PHRA"). (Doc. No. 1 at 2.)
However, Plaintiff does not assert which, if any, rights have been violated under the PHRA, nor
does she present any evidence to support her claim. Defendants moved for summary judgment
on the PHRA claim and Plaintiff's opposition brief fails to respond. (See Doc. No. 37 at 6 n.3;
Doc. No. 47.) To the extent that Plaintiff has asserted a claim under the PHRA, the Court will
dismiss it because Plaintiff has abandoned the claim. See Smith v. Lucas, No. 4:05-CV-1747,
2007 WL 1575231, at *10 (M.D. Pa. May 31, 2007) (granting summary judgment against claims
plaintiff failed to defend in his opposing brief). In addition, to the extent that Plaintiff's PHRA
are coextensive with her ADA and ADEA claims, those claims are also due to be dismissed in
accordance with this Court's memorandum. See Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir.
1996).

Settlement. (Doc. No. 37 at 4.)   HSD's reliance on the Settlement is different than Defendant Bankus's, however, because the Settlement specifically provided that Plaintiff's actions pending before the PHRC and EEOC against HSD and "any subsequent action in State or Federal Court arising therefrom" were not released. (Doc. No. 39, Ex. 14 ¶ 3.) Therefore, the Court must determine whether Plaintiff's claims under the First Amendment, Title VII, and the Fourteenth Amendment guarantee of equal protection "aris[e] therefrom" Plaintiff's PHRC and EEOC complaints.  In making this determination, the Court must interpret the meaning of the phrase "arising therefrom."

"In Pennsylvania, the paramount goal of contract interpretation is to determine the intent of the parties.  The strongest manifestation of that intent is the wording of the agreement itself.  The language used in a contract is normally to be given its ordinary meaning in the absence of evidence of some special meaning."  Nova Chemicals, Inc. v. Sekisui Plastics Co., Ltd., 579 F.3d 319, 323 (3d Cir. 2009) (citations, quotation marks, and alteration marks omitted).

The phrase "arising therefrom" is a term of art used in the context of determining whether a plaintiff exhausted her administrative remedies by filing an EEOC complaint before filing a claim in court.  See, e.g., Waters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984) ("The relevant test in determining whether appellant was required to exhaust her administrative remedies, therefore, is whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, *or the investigation arising therefrom*." (emphasis added)).  "The purpose of this administrative exhaustion requirement is to put the EEOC on notice of the plaintiff's claims and afford it 'the opportunity to settle disputes through conference, conciliation, and persuasion, avoiding unnecessary action in court.'" Webb v. City of Philadelphia, 562 F.3d 256, 262 (3d Cir.

2009) (citation omitted).

In explaining this standard, the Third Circuit has affirmed that the "'parameters of a civil action in the District Court are defined by the scope of the EEOC investigation *which can reasonably be expected to grow out of the charge of discrimination*, including new acts which occurred during the pendency of proceedings before the Commission.'" Anjelino v. New York Times Co., 200 F.3d 73, 94 (3d Cir. 1999) (quoting Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir. 1976)) (emphasis added). Therefore, where the EEOC has had cognizance of the full scope of the situation during its settlement efforts, the purpose of the notification requirement has been served. Id.; see, e.g., Webb, 562 F.3d at 262-63 (finding that a sex discrimination claim fell outside scope where plaintiff only filed a charge of religious discrimination with the EEOC); Atkinson v. LaFayette College, 460 F.3d 447, 453 (3d Cir. 2006) (affirming district court that dismissed retaliation claim predicated on activities protected under Title IX as not "arising therefrom" Title VII retaliation claim raised by plaintiff in EEOC questionnaire).

At the time she signed the Settlement, Plaintiff had five complaints pending before the PHRC and the EEOC that included both age discrimination and retaliation claims. Plaintiff's Title VII discrimination claims are not those which could reasonably have been expected to grow out of the age discrimination charges she filed. Therefore, Plaintiff's Title VII claim does not arise from her earlier claims and is precluded by the Settlement.[5]

---

[5] The Court notes that even if Plaintiff's Title VII claim was not precluded by the Settlement, it would still be dismissed as a matter of law. Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). Plaintiff has not presented any evidence to show that she was

In contrast, Plaintiff's equal protection claim could reasonably have been expected to grow out of the age discrimination and retaliation claims, since Plaintiff previously averred that she was treated unequally on the basis of her age. Likewise, Plaintiff's First Amendment retaliation claims can be said to arise from her PHRC complaints, since Plaintiff has previously alleged that she was retaliated against for asserting her rights. Therefore, the Court finds that both the First Amendment retaliation and equal protection claims are not precluded by the Settlement and must be addressed.

### i.      First Amendment retaliation claims

Title 42 U.S.C. § 1983 provides the cause of action for plaintiffs alleging a First Amendment retaliation claim against a public state employer. See, e.g., O'Connor v. City of Newark, 440 F.3d 125, 126-28 (3d Cir. 2006); see also Livadas v. Bradshaw, 512 U.S. 107, 132 (1994); Anspach v. City of Philadelphia, Dept. of Public Health, 503 F.3d 256, 261 (3d Cir. 2007). In its motion for summary judgment, HSD does not dispute whether Plaintiff's actions of filing complaints with the PHRC were protected by the First Amendment. Instead, HSD raises several different challenges to Plaintiff's claim. First, HSD asserts that it is shielded against Plaintiff's First Amendment claim pursuant to Monell v. Department of Social Services, 436 U.S. 658 (1978), and its progeny. (Doc. No. 37 at 4.) Second, HSD asserts that Plaintiff's First Amendment claims are precluded by the ADEA because the ADEA is the "exclusive remedy for allegations of age discrimination in employment." (Id. at 5-6.) Third, HSD argues that Plaintiff has failed to establish any compensable injury. (Id. at 6.) Finally, HSD asserts that the record does not support a finding of retaliation. (Id. at 21.) Because the Court holds that Plaintiff's First

---

discriminated against on the basis of any such characteristic.

Amendment retaliation claims based on her filing of an age discrimination complaint are precluded by the ADEA, the Court will not address HSD's other defenses. See <u>Satterfield v. Borough of Schuylkill Haven</u>, 12 F. Supp. 2d 423, 437 (E.D. Pa. 1998) ("Because we have dismissed these claims on the ground of statutory preclusion, we need not consider the Defendants' motivating factor, rational basis, and qualified immunity arguments.").

The issue of whether a plaintiff's § 1983 claims for retaliation under the First Amendment rights may be raised separately from her ADEA retaliation claims has not yet been addressed by the Third Circuit. However, in the context of equal protection claims, circuit courts that have addressed the issue have held that the ADEA is the exclusive remedy for claims of age discrimination in employment. See <u>Ahlmeyer v. Nevada Sys. of Higher Educ.</u>, 555 F.3d 1051, 1060-61 (9th Cir. 2009) ("We hold the ADEA is the exclusive remedy for claims of age discrimination in employment, even those claims with their source in the Constitution."); <u>Migneault v. Peck</u>, 158 F.3d 1131, 1140 (10th Cir. 1998) (addressing equal protection claim and holding ADEA provides the sole remedy for age discrimination claims by individuals), <u>abrogated on other grounds by</u> <u>Kimel v. Fla. Bd. of Regents</u>, 528 U.S. 62 (2000), <u>reaffirmed by</u> <u>Migneault v. Peck</u>, 204 F.3d 1003, 1004 n.1 (10th Cir. 2000); <u>Lafleur v. Texas Dep't of Health</u>, 126 F.3d 758, 760 (5th Cir. 1997) (same); <u>Zombro v. Baltimore City Police Dep't</u>, 868 F.2d 1364, 1369 (4th Cir. 1989) ("The conclusion is irresistible that the ADEA provides the exclusive judicial remedy for claims of age discrimination."). The instant case presents a slightly different scenario than previous decisions, however, because Plaintiff has asserted a First Amendment

retaliation claim instead of an equal protection discrimination claim.[6]

Generally, the implied preclusion of one statute by another is disfavored.  See Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 442 (1987).  However, the Supreme Court has held that, "[w]hen the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 20 (1981).  The Supreme Court recently reiterated the importance of congressional intent in such an analysis:

> "[t]he crucial consideration is what Congress intended." [Smith v. Robinson, 468 U.S. 992, 1012 (1984)].  If Congress intended a statute's remedial scheme to "be the exclusive avenue through which a plaintiff may assert [the] claim," id., at 1009, the § 1983 claims are precluded.  See [Rancho Palos Verdes v. Abrams, 544 U.S. 113, 120-121 (2005)] ("The critical question, then, is whether Congress meant the judicial remedy authorized by [the statute] to coexist with an alternative remedy available in a § 1983 action").
>
> In those cases in which the § 1983 claim is based on a statutory right, "evidence of such congressional intent may be found directly in the statute creating the right, or inferred from the statute's creation of a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." Id. at 120 (internal quotation marks omitted).  In cases in which the § 1983 claim alleges a

---

[6] As the Ninth Circuit recognized in Ahlmeyer, age discrimination claims under the Constitution are subject to rational basis scrutiny whereas claims of discrimination based on race, sex, or speech are entitled to heightened scrutiny. See Ahlmeyer, 555 F.3d at 1059 n.8; see also Snell v. City of York, 564 F.3d 659, 668 (3d Cir. 2009).  However, in looking at the "comprehensive remedial scheme" provided by the ADEA, the Ahlmeyer court concluded that the ADEA "should be read as precluding § 1983 actions in the area of age discrimination in employment." Ahlmeyer, 555 F.3d at 1060.  Based on this Court's analysis, the Court finds no basis for the heightened level of scrutiny afforded to free speech claims to alter the overall analysis of the Ahlmeyer court or the framework set forth by the Supreme Court in Fitzgerald v. Barnstable Sch. Comm., – U.S. –, 129 S. Ct. 788 (2009).

constitutional violation, lack of congressional intent may be inferred from a comparison of the rights and protections of the statute and those existing under the Constitution. Where the contours of such rights and protections diverge in significant ways, it is not likely that Congress intended to displace § 1983 suits enforcing constitutional rights. Our conclusions regarding congressional intent can be confirmed by a statute's context. Id. at 127 (Breyer, J., concurring) ("[C]ontext, not just literal text, will often lead a court to Congress' intent in respect to a particular statute").

In determining whether a subsequent statute precludes the enforcement of a federal right under § 1983, we have placed primary emphasis on the nature and extent of that statute's remedial scheme. See Sea Clammers, [453 U.S. at 20] ("When the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983").

Fitzgerald v. Barnstable Sch. Comm., – U.S. –, 129 S. Ct. 788, 793-94 (2009). In reviewing its jurisprudence of § 1983 claims found to be precluded by other federal statutes, the Court noted:

In all three cases, the statutes at issue required plaintiffs to comply with particular procedures and/or to exhaust particular administrative remedies prior to filing suit. Sea Clammers, [453 U.S. at 6]; Smith, [468 U.S. at 1011-1012]; Rancho Palos Verdes, [544 U.S. at 122]. Offering plaintiffs a direct route to court via § 1983 would have circumvented these procedures and given plaintiffs access to tangible benefits-such as damages, attorney's fees, and costs-that were unavailable under the statutes. "Allowing a plaintiff to circumvent" the statutes' provisions in this way would have been "inconsistent with Congress' carefully tailored scheme." Smith, [468 U.S. at 1012].

Fitzgerald, 129 S. Ct. at 795 (footnote omitted).

Under the ADEA, the applicable section for retaliation claims states in pertinent part:

It shall be unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C. § 623(d). As a precondition to filing a claim in federal district court, a plaintiff suing

for retaliation under the ADEA must file a timely administrative charge with the EEOC. 29

U.S.C. § 626(d) ("No civil action may be commenced . . . until 60 days after a charge alleging

unlawful discrimination has been filed with the [EEOC]. Such a charge shall be filed . . . within

180 days after the alleged unlawful practice occurred . . . ."). In addition, as the Ninth Circuit's

decision in Ahlmeyer explained, the ADEA also places limits on the damages available under it:

> Compensatory damages for pain and suffering and punitive damages
> are not available under the ADEA, which employs its complex
> enforcement scheme "to help employers and workers find ways of
> meeting problems arising from the impact of age on employment." 29
> U.S.C. § 621. Relief under the ADEA is limited to "judgments
> compelling employment, reinstatement, or promotion," the recovery
> of unpaid minimum wages or overtime pay, and reasonable attorneys'
> fees and costs. See 29 U.S.C. §§ 216(b), 626(b). In other words, the
> ADEA "was structured to facilitate and encourage compliance
> through an informal process of conciliation and mediation." Zombro,
> 868 F.2d at 1366. Therefore, the narrower scope of the ADEA is
> reflected in the more limited relief Congress afforded plaintiffs.

Ahlmeyer, 555 F.3d at 1059; see also Potence v. Hazleton Area Sch. Dist., 357 F.3d 366, 373 (3d

Cir. 2004) ("Inasmuch as the [ADEA] expressly authorizes the imposition of liquidated damages

against a municipality, even though such damages are punitive in nature, we conclude that the

District Court did not err in assessing liquidated damages against the School District."); Steward

v. Sears Roebuck & Co., 312 F. Supp. 2d 719, 730 (E.D. Pa. 2004) ("Neither punitive damages

nor damages for pain and suffering are recoverable under the ADEA.") (citation omitted);

Marrow v. Allstate Sec. & Investigative Serv., Inc., 167 F. Supp. 2d 838, 845 (E.D. Pa. 2001)

(noting that the Third Circuit has held that pain and suffering damages are unavailable under the

ADEA, and although it has not reached the question of whether punitive damages are available,

restricting the availability of punitive damages makes sense in light of the fact that 29 U.S.C. §

626(b) limits the availability of liquidated damages to cases involving "willful violations" of the

ADEA) (citing Rogers v. Exxon Res. & Eng. Co., 550 F.2d 834, 839 (3d Cir.1977), overruled on other grounds, Smith v. Jos. Schlitz Brewing Co., 604 F.2d 220 (3d Cir.1979)).

In the context of the ADEA, if a plaintiff were allowed to assert a First Amendment retaliation claim for an employer's retaliation for filing an age discrimination complaint, she would be able to avoid the statutory framework established by Congress to deal with age discrimination claims. Outside of the prison context, there is no administrative exhaustion requirement for First Amendment retaliation claims. See Patsy v. Bd. of Regents of Fla., 457 U.S. 496, 516 (1982) ("[W]e conclude that exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983."). Punitive damages for a First Amendment retaliation claim are also available where a jury finds reckless, callous, intentional or malicious conduct. Springer v. Henry, 435 F.3d 268, 281 (3d Cir. 2006) (citations omitted). As a result, "'[a]llowing a plaintiff to circumvent' the statutes' provisions in this way would . . . [be] "inconsistent with Congress" carefully tailored scheme.'" Fitzgerald, 129 S. Ct. at 795 (quoting Smith, 468 U.S. at 1012).

Therefore, the Court holds that where First Amendment retaliation claims brought pursuant to § 1983 are based on an age discrimination claim, the First Amendment claims are precluded by the ADEA. Plaintiff has acknowledged that her First Amendment claims were based on "alleged retaliation based upon age." (Doc. No. 47 at 5.) As a result, Plaintiff's First Amendment retaliation claims are precluded by the ADEA and summary judgment is appropriate.


ii.     **Equal Protection**

Plaintiff's next claim to be addressed is her claim that HSD violated her right to equal protection under the Fourteenth Amendment. (Doc. No. 1 ¶ 13.) Like Plaintiff's First Amendment retaliation claims, the Court finds that these claims are precluded under the ADEA. See Part IV.B.i supra. Therefore, Plaintiff's equal protection claim fails as a matter of law and will be dismissed.[7]

### iii. ADEA claims

The Court turns to Plaintiff's ADEA claims. "The ADEA prohibits employers from discriminating against individuals in hiring, discharge, compensation, term, conditions, or privileges of employment on the basis of their age." Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001) (citing 29 U.S.C. § 623(a)(1)). Age discrimination may be established by direct or indirect evidence. Id. (citation omitted). Under the ADEA, the parties' burdens in establishing and defending claims by indirect evidence are determined by the procedure set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Stanziale v. Jargowsky, 200 F.3d 101, 105 (3d Cir. 2000).[8]

---

[7] The Court notes that Plaintiff's claim would also fail on the basis that the Supreme Court has held that a "class of one" equal protection claim fails in the public employment context. See Enquist v. Oregon Department of Agriculture, -- U.S. --, 128 S. Ct. 2146, 2151 (2008). As a result, the Equal Protection Clause is not implicated in the instant case where HSD is alleged to have made an individualized, subjective personnel decision in a seemingly arbitrary or irrational manner. See id. at 2155.

[8] The Supreme Court's recent decision in Gross v. FBL Financial Services, Inc., – U.S. –, 129 S. Ct. 2343 (2009), addressed a plaintiff's burden of persuasion at trial on a mixed-motive age discrimination claim. 129 S. Ct. at 2352 ("[A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action."). In Gross, the Supreme Court held that the burden of persuasion does not shift to a party defending an ADEA mixed-motive discrimination claim, stating that "[t]his Court has never held that [the Price Waterhouse] burden-shifting framework applies to ADEA claims." Id. at 2348-49 (citing Price Waterhouse v.

Under the <u>McDonnell Douglas</u> framework, a plaintiff must first produce evidence sufficient to convince a reasonable factfinder as to all of the elements of a prima facie case of discrimination. <u>Stanziale</u>, 200 F.3d at 105. If a plaintiff establishes a prima facie case, "the burden of production (but not the burden of persuasion) shifts to the defendant, who must then offer evidence that is sufficient, if believed, to support a finding that the defendant had a legitimate, nondiscriminatory reason for the adverse employment decision." <u>Stanziale</u>, 200 F.3d at 105 (citations and internal alterations omitted). "If a defendant satisfies this burden, a plaintiff may then survive summary judgment by submitting evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." <u>Id.</u>; <u>see also</u> <u>Torre v. Casio, Inc.</u>, 42 F.3d 825, 830 (3d Cir. 1994) (noting that to survive summary judgment, "a plaintiff may prevail 'by either (i) discrediting the [employer's] proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action'" (quoting <u>Fuentes v. Perskie</u>, 32 F.3d 759, 764 (3d Cir. 1994))).

In the present case, Plaintiff has asserted both an age discrimination claim and a

<hr>

<u>Hopkins</u>, 490 U.S. 228 (1989)).

As a result of <u>Gross</u>, courts have grappled with whether the same rule applies to a plaintiff's burden of production, or whether the <u>McDonnell Douglas</u> framework continues to apply. <u>See</u> <u>Ferruggia v. Sharp Electronics Corp.</u>, No. 05-5992, 2009 WL 2634925, at *3-4 (D.N.J. Aug. 25, 2009) (reviewing courts' responses to interpreting the ADEA burden of production in light of <u>Gross</u>). However, the Third Circuit has determined that, without further direction, courts within the circuit would continue to apply the <u>McDonnell Douglas</u> framework. <u>See</u> <u>Heilman v. Allegheny Energy Serv. Corp.</u>, No. 08-4523, 2009 WL 3792419, at *2 (3d Cir. Nov. 12, 2009) (unpublished opinion).

retaliation claim.  The Court will address each in turn.

### 1.    Discrimination Claim

The Court finds that Plaintiff has not proffered sufficient evidence to establish a prima facie ADEA discrimination claim.  The Third Circuit has noted several factors to determine whether a stray remark is probative of discrimination, including "the declarant's position in the corporate hierarchy, the purpose and content of the statement, and the temporal connection between the statement and the challenged employment action." Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 133 (3d Cir. 1997); see also Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1112 (3d Cir. 1997).  The only direct evidence that Plaintiff has produced of discrimination on the basis of her age is that Bankus once referred to Plaintiff's classroom as having a "musty butt smell." (Doc. No. 46 ¶ 60.)  The Court finds that this statement is not probative of age discrimination.  There is nothing to indicate to the Court that such a statement, made in the context of Bankus entering into Plaintiff's basement classroom, even implicates ageism.  Without more, Plaintiff has failed to present sufficient direct evidence to satisfy her burden of production under the ADEA.

Plaintiff has not presented sufficient indirect evidence to survive summary judgment. The Third Circuit has outlined what a plaintiff must present to establish a prima facie ADEA claim:

> When evaluating ADEA discrimination claims based on indirect evidence, a plaintiff may establish a prima facie case of age discrimination under the ADEA by demonstrating that she: (1) was a member of a protected class, i.e., that she was over forty, (2) is qualified for the position, (3) suffered an adverse employment decision, (4) and was ultimately replaced by a person sufficiently younger to permit an inference of age discrimination. To survive a motion for summary judgment, the evidence must be sufficient to convince a reasonable factfinder to find all of the elements of the

prima facie case.

<u>Duffy</u>, 265 F.3d at 167 (citations, footnotes, and interior alterations omitted); <u>see also</u> <u>Torre</u>, 42 F.3d at 831 (noting that under the fourth prong, a plaintiff may show evidence that a younger employee received comparatively more favorable treatment). As HSD points out, Plaintiff has provided no evidence as to who replaced her, or any comparable teachers who engaged in conduct that was "nearly identical" to her own who were treated more favorably. (Doc. No. 37 at 8.) Plaintiff asserts that a declaration that she submitted with her brief in opposition contains evidence "which clearly shows instances in which others (younger teachers) were treated more favorably than she was." (Doc. No. 47 at 25.) However, after a careful review of Plaintiff's declaration, the Court is unable to find any such facts. (<u>See</u> Doc. No. 48.) As such, Plaintiff has failed to satisfy the fourth prong of the <u>McDonnell Douglas</u> framework.

Because Plaintiff has not met her burden of production under <u>McDonnell Douglas</u>, she has not presented a genuine issue of material fact. Therefore, summary judgment is appropriate on her age discrimination claim.

### 2. Retaliation Claim

In contrast, Plaintiff has established a prima facie claim of retaliation under the ADEA. "To establish a claim of unlawful retaliation in violation of the ADA and ADEA, a plaintiff must show: 1) protected activity by the employee; 2) adverse employment action by the employer; and 3) a causal connection between the protected activity and the adverse employment action." <u>Walsh v. Wal Mart Stores, Inc.</u>, 200 Fed. Appx. 134, 136 (3d Cir. 2006) (unpublished opinion) (citing <u>Nelson v. Upsala Coll.</u>, 51 F.3d 383, 386 (3d Cir. 1995)). Distilling her allegations to the basic facts, Plaintiff's claim is that, in retaliation for her filing a claim with the PHRC, HSD

"instituted a phony IIP [sic] and other harassing policies" against her. (Doc. No. 47 at 19-20.)

As further evidence of retaliation, Plaintiff points to her August 25, 2006, suspension without

pay. (Id. at 7-8.)

### A.    HSD's Burden

HSD does not challenge that Plaintiff has established a prima facie ADEA retaliation

claim, choosing instead to focus on its own burden of production under the McDonnell Douglas

framework.  Since Plaintiff has established a prima facie case, "the burden of production (but not

the burden of persuasion) shifts to the defendant, who must then offer evidence that is sufficient,

if believed, to support a finding that the defendant had a legitimate, nondiscriminatory reason for

the adverse employment decision[s]." Stanziale, 200 F.3d at 105 (citations and internal

alterations omitted). In the present case, HSD has put forth testimony that its policy is that ITIPs

are not imposed to punish teachers, but are instead issued to help teachers to improve their

teaching skills. (Doc. No. 39, Ex. 22 ¶ 12; Doc. No. 39, Ex. 32 at 3.)  HSD has presented further

evidence that Plaintiff was given an ITIP "in attempt to address areas of concern that . . .

occurred prior to and including the 2004-2005 school year." (Doc. No. 38 ¶ 38; Doc. No. 39, Ex.

23).  Specifically, HSD has compiled documents prepared by its employees that implicate

Plaintiff's involvement in a number of instances of inappropriate and unprofessional behavior.

(See Doc. No. 39, Ex. 21.)  For example, Plaintiff was reported to have referred to a special

education student as a goat, failed to report to her assigned classroom as scheduled, been accused

by a co-teacher of contributing to confusion in the classroom, scheduled meetings when she was

assigned to teach class, and been subject to a number of other complaints. (Doc. No. 38 ¶¶ 30-

31; see also Doc. No. 39, Ex. 21.)

Regarding Plaintiff's placement on suspension and termination, HSD administrators maintain that they were complying with 24 P.S. § 11-1122, which allows for a teacher's contract to be terminated where there is "immorality; incompetency; . . . [or] persistent negligence in the performance of [the teacher's] duties . . . ." 24 P.S. § 11-1122; (see also Doc. No. 39, Ex. 22 ¶ 25). HSD has presented evidence that HSD administration officials recommended Plaintiff's suspension and termination on the basis of her continued lack of cooperation with administrators and after finding a discrepancy in her employment and criminal history. (Doc. No. 38 ¶ 109; Doc. No. 39, Exs. 22, 35).

According to the testimony and documents provided by HSD, Plaintiff was not following through on the suggestions for improvement outlined in her ITIP, nor were her peer-to-peer relationships improving. A December 7, 2005 observation form filled out by Bankus recounts her observation of a class of five students taught by Plaintiff. (Doc. No. 39, Ex. 27 Part 2 at 20-21.) In that evaluation, Plaintiff is listed as needing improvement in a number of areas, particularly in Plaintiff's management of students' behavior and classroom decorum. (Id.) On January 20, 2006, Bankus recorded a second observation of Plaintiff's classroom; again, with only seven students in the class, the observation paints a picture of a classroom that is out of order. (Doc. No. 39, Ex. 27 Part 1 at 19-21.) The description of the actions in the classroom indicate that Plaintiff has minimal control: students are described as "agitated and annoyed, uncooperative"; several students show up late without being disciplined; and students leave their desks to participate in disruptive behavior. (Id.) Yet another observation of Plaintiff's classroom done by Bankus on February 3, 2006, recounts an unruly classroom where Plaintiff fails to give clear instruction and management, allowing an inordinate amount of profanity and disrespectful

behavior by the students. (Doc. No. 39, Ex. 27 Part 1 at 7-13.)  On February 6, 2006, Bankus prepared an unsatisfactory rating for Plaintiff covering the period from August 29, 2005, to February 6, 2006. (Doc. No. 39, Ex. 27 Part 1 at 2-3.) On April 18, 2006, Bankus prepared a letter of reprimand recounting her informal observation of Plaintiff's classroom management on April 11, 2006. (Doc. No. 39, Ex. 33.)  In that letter, Bankus states that students were not in their seats when she entered the classroom for the observation and that Plaintiff had not complied with her professional improvement plan to post classroom rules–she had merely placed the rules on a table next to the door. (Id.)

Likewise, Plaintiff's deteriorating relationship with her co-workers is outlined in a number of emails between Plaintiff and her co-workers.  HSD has produced documents regarding a disagreement Plaintiff had with another teacher over students' tardy policies in November 2005. (Doc. No. 39, Ex. 27 Part 2 at 27-28.)  According to secretary Chauntia Kennedy's recounting of the episode, another secretary, Vincenzina Jenkins, entered Plaintiff's classroom to assist with removing unruly students who appeared to be assaulting each other. (Id. at 27.)  However, after Jenkins tried to remove the students, Plaintiff "pushe[d] Mrs. Jenkins out of the classroom and [told] her that she [was] disrupting the educational process." (Id.; see also Doc. No. 39, Ex. 27 Part 1 at 30.)  In a January 14, 2006, letter recounting a meeting with HSD administrators the day before, Plaintiff refers to the secretaries as "amanuenses," and makes reference to administrators who gave students late passes as "foolhardy and enabling." (Doc. No. 39, Ex. 27 Part 1 at 23.)  Another set of emails from on or about January 30, 2006, recount further disagreement between Jenkins and Plaintiff regarding mistakes Plaintiff allegedly made on a student's IEP. (Id. at 16.)  Other emails include: a January 25, 2006 email from HSD

administrator Charles Crewshaw to Plaintiff indicating that she submitted an IEP with a number of errors (id. at 17-18); a February 3, 2006 email from the substitute teaching service administrator complaining about Plaintiff's lack of protocol in dealing with her classroom substitute (id. at 5); and a February 1-3, 2006 email exchange between Plaintiff and HSD administrator Charles Bender indicating that Plaintiff did not grasp the student absence excuse policy. (Id. at 14-15.)

In addition to the breakdown in the relationship between HSD administrators and Plaintiff, HSD also puts forward evidence to support its claim that Plaintiff's termination was partly based on her lack of truthfulness in her employment application. Specifically, on her original application for employment with HSD, Plaintiff responded to a question as to why she left her previous employment with Mechanicsburg Area School District ("MASD") by stating "TEMPORARY – NO CONTRACT." (Doc. No. 38 ¶ 87; Doc. No. 39, Ex. 15 at 5.) HSD has presented the testimony of the District's Assistant Director of Human Resources, Marlena Geiger, that she came across a discrepancy regarding Plaintiff's previous employment with MASD while reviewing a book titled "Pennsylvania School Personnel Actions" by Michael I. Levin in June 2006. (Doc. No. 38 ¶ 89; Doc. No. 39, Ex. 35 ¶¶ 3-4.) In that earlier case between Plaintiff and MASD, Phillis v. Board of School Directors of Mechanicsburg Area School Dist., 617 A.2d 830 (Pa. Cmwlth.Ct. 1992), Plaintiff had been hired to teach as a "temporary professional employee"; however, in her second year of teaching she "received an unsatisfactory rating and was dismissed." 617 A.2d at 832. Her dismissal was pursuant to Section 1108(a) of the Public School Code of 1949, which states that a temporary professional employee who has been rated as unsatisfactory can be dismissed. 617 A.2d at 832 n.2 (citing 24 P.S. § 11-1108(a)).

Furthermore, in response to the question of "Were you ever convicted of a criminal offense?", Plaintiff indicated on her original employment application that she had not. (Doc. No. 39, Ex. 15 at 6.)  However, Plaintiff has conceded that she was convicted of a driving while under the influence offense in New Mexico in 1995. (Doc. No. 39, Ex. 37, Request No. 7.)  According to Geiger's affidavit, she uncovered the discrepancy in 2006 while addressing a certification question raised during one of Plaintiff's grievance proceedings. (Doc. No. 38 ¶¶ 91-97; Doc. No. 39, Ex. 35 ¶¶ 5-9.)  HSD has submitted the affidavit of Mark Holman, HSD's director of human resources, which supports Geiger's recollection of the way that Plaintiff's prior conviction came to light in 2006. (Doc. No. 39, Ex. 22 ¶¶ 20-21.)

The Court finds that, with the cumulation of all this evidence, HSD has presented sufficient evidence "to support a finding that the defendant had a legitimate, nondiscriminatory reason for the adverse employment decision[s]." Stanziale, 200 F.3d at 105 (citations and internal alterations omitted).

### B.      Plaintiff's Burden

Since HSD has satisfied its burden, the burden shifts back to Plaintiff.  In order to create a genuine issue of material fact as to whether HSD's proffered reasons are pretextual, Plaintiff must point to some evidence from which a factfinder could reasonably either (1) disbelieve HSD's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of HSD's action. Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006) (citing Fuentes, 32 F.3d at 764).  Simply put, Plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [HSD's] proffered legitimate reasons . . . that a reasonable factfinder could

rationally find them unworthy of credence, and hence infer that [HSD] did not act for [the asserted] non-discriminatory reasons." Id. (citation and internal quotation marks omitted)). Where a "defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder." Id. at 707 (citing Fuentes, 32 F.3d at 764 n.7). This is because "the rejection of some explanations may so undermine the employer's credibility as to enable a rational factfinder to disbelieve the remaining rationales, even where the employee fails to produce evidence particular to those rationales." Id. (citing Fuentes, 32 F.3d at 764 n.7).

After careful review, the Court finds that Plaintiff has failed to submit sufficient evidence to cast the legitimacy of HSD's actions into doubt. As a result, Plaintiff has not met the burden of production necessary to escape summary judgment.

First, Plaintiff seeks to cast doubt on the legitimacy of the ITIP instituted against her in the Fall of 2005. Plaintiff argues in her own statement of facts that "[t]here were no complaints noted from anyone about the Plaintiff during the 2005-06 school year when the ITIP was given to Plaintiff." (See Doc. No. 46 ¶ 38.) A lack of complaints at the beginning of the new school year does not further Plaintiff's case. Given administrators' concerns over Plaintiff's performance at the conclusion of the 2004-05 year, it is only logical to expect that an ITIP would be instituted to help her improve at the outset of the following school year. Plaintiff has presented insufficient evidence to cause a factfinder to reasonably believe either that HSD's articulated legitimate reasons for instituting the ITIP were false or that "an invidious discriminatory reason was more likely than not a motivating or determinative cause of [HSD's] action." Stanziale, 200 F.3d at 105.

Second, Plaintiff has failed to present sufficient evidence that could cause a factfinder to reasonably disbelieve HSD's basis for Plaintiff's suspension and termination in August 2006. HSD has presented a number of documents prepared by school administrators that show Plaintiff's in-class performance and her peer-to-peer relationships to be lacking. Plaintiff argues that the observation notes made by Bankus lacked confirmation of an outside witness, and that given the nature of her students' known behavioral problems "[i]t was normal to expect these types of students to act out . . . ." (Doc. No. 46 ¶ 50.) As support, Plaintiff points to a number of emails from school administrators detailing daily disciplinary actions against particular students, including suspensions. (See Doc. No. 46, Ex. 12.) However, while these emails show that the category of students with which Plaintiff dealt were often disciplined, it does not contradict the lack of decorum reported by Bankus to have occurred in Plaintiff's classroom–or the numerous accounts of Plaintiff's lack of professionalism in the workplace. Additionally, the low evaluations regarding Plaintiff's teaching are not based on subjective criteria such as "teamwork" or "attitude," but are instead based on specific accounts of her interaction with co-workers and students. See Tomasso, 445 F.3d at 706 ("[L]ow evaluation scores may be a pretext for discrimination, especially where . . . an employer uses subjective criteria such as 'attitude' and 'teamwork' to rate its employees." (citations omitted)). As a result, Plaintiff's evidence does not provide sufficient basis for a reasonable juror to believe that HSD's reasons for firing Plaintiff were merely pretext or that "an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Stanziale, 200 F.3d at 105 (citations and internal alterations omitted); see also Rosetsky v. Nat'l Bd. of Medical Examiners of the United States of America, Inc., No. 08-1827, 2009 WL 3428492, at *3 (3d Cir. Oct. 26,

2009) (unpublished opinion) ("No reasonable fact finder could conclude anything other than that her termination resulted from her own unprofessional conduct, and not from any discriminatory or retaliatory animus on her employer's part.").

Plaintiff has also failed to cast sufficient doubt on HSD's reliance on the discrepancy in her employment records. Even if HSD's administrators were mistaken in their belief that Plaintiff's employment history was intentionally misleading, this does not make HSD's reason pretextual. See Fuentes, 32 F.3d at 765 ("To discredit the employer's proffered reason, however, the plaintiff cannot show that the employer's decision was wrong or mistaken since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent."); see also Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997) (noting that "[i]n simpler terms" a plaintiff must show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason"). Plaintiff argues that she truthfully answered a question of "Within the last ten years, have you been fired from any job for any reason?" (Doc. No. 46 ¶ 110; see also Doc. No. 39, Ex. 15 at 4.) The Court is persuaded by Plaintiff on this point. Rather than being "fired" by MASD, it appears that she was merely "let go." In addition, her relationship with MASD, which ended in 1990, expired outside the time period outlined in the question. (See Doc. No. 46 ¶ 110.) The Court notes that this is not dispositive, however, because by stating "TEMPORARY – NO CONTRACT" on her application, Plaintiff was less than forthright on why she left her previous employment. As the Pennsylvania Commonwealth Court noted in review of the employment action in 1993 "[i]f Phillis had received a satisfactory rating, she would have been entitled to tenure and the status of a 'professional employee' under

Section 1108(b) of the Code, 24 P.S. § 11-1108(b)." <u>Phillis</u>, 617 A.2d at 832. Therefore, it would not have been unreasonable for HSD administrators who uncovered this discrepancy in 2006 to believe that Plaintiff's employment application was inaccurate. Plaintiff has not put forward evidence that would cause a reasonable factfinder to either disbelieve that testimony or believe that it was only used as a pretext.

Finally, Plaintiff argues that HSD administrators were aware of Plaintiff's DUI conviction as early as August 2002. In support, Plaintiff submits Exhibit 25, which consists of two pages of forms she submitted in an employment application. (Doc. No. 46, Ex. 25.) The first page of Exhibit 25 is a PDE-338G form, that is signed by Plaintiff and dated August 19, 2002. (<u>Id.</u> at 1.) In response to Question 15 regarding whether she had ever been convicted of a crime, Plaintiff stated "YES" and wrote "Letter and court documents on file (DUI)" above the printed question. (<u>Id.</u>) The next page listed as Exhibit 25 is a PDE-338E form, which is also dated August 19, 2002, and signed by Holman. (<u>Id.</u> at 2.) Taken together, it is plausible that Holman would have seen both pages of this exhibit–and, as a result, been made aware of Plaintiff's criminal record in 2002.[9] Based on Plaintiff's evidence, a reasonable factfinder could infer that

_____

[9] The Court notes that it reaches this conclusion after viewing the evidence in a light most favorable to Plaintiff. Yet the evidence presented does not definitely show that Holman or HSD was aware of the DUI prior to 2006. Plaintiff's Exhibit 25 contains different forms. PDE-338G is a general application to be filled out by the candidate herself. <u>See</u> Pennsylvania Department of Education Bureau of School Leadership and Teacher Quality, Professional Educator Certification: Emergency Permits and Act 97 Waivers (June 2008), available at www.portal.state.pa.us. In contrast, PDE-338E is an Emergency Permit/Act 97 Waiver Agreement which is completed, in part, by the Chief School Administrator–Holman in this case. <u>See id.</u> It is unclear to the Court whether these forms were filled out together and kept contemporaneously in HSD's personnel files. According to Geiger's testimony in her affidavit, the PDE-338G form was not kept in the custody of HSD. Yet Geiger also states in her affidavit that in the case of "emergency certification applications . . . 338G forms are maintained in District files to show proof that we applied for an emergency certificate." (Doc. No. 39, Ex. 35 ¶

Holman and HSD knew of her DUI conviction prior to 2006. A reasonable factfinder could then infer that HSD and Holman only pretended to discover the DUI in 2006 to use as a pretext for retaliating against Plaintiff for her age retaliation claim.

The Court finds that such inferences are too far attenuated to meet Plaintiff's burden to defeat summary judgment. Even if a reasonable jury agreed with Plaintiff's theory regarding when her criminal history came to light, she does not present sufficient evidence that would cause a reasonable factfinder to disbelieve the bulk of HSD's evidence. Of the "bagful of legitimate reasons" proffered by HSD, Plaintiff has failed to cast substantial doubt on them. See Tomasso, 445 F.3d at 706; see also Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 370 (3d Cir. 2008) (noting that a plaintiff's rebuttal evidence "must allow a fact-finder reasonably to infer that *each of the employer's proffered non-discriminatory reasons* was either a post hoc fabrication or otherwise did not actually motivate the employment action" (emphasis added)); Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (noting that a plaintiff must "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision"); Anderson v. Equitable Resources, Inc., Civ. No. 08-952, 2009 WL 4730230, at *11 (W.D. Pa. Dec. 4, 2009) (finding that although plaintiff had called into question some of the defendant's proffered reasons for termination, he had not succeeded in undermining defendant's

_____

7.)
    Even if they were filed together, however, Plaintiff has submitted no evidence to prove that Holman ever saw the forms together or that he was aware of the discrepancy in Plaintiff's criminal history until it was brought to his attention in 2006. Holman's signature does not appear anywhere on the PDE-338G form, which could have been filled out and sent in by Plaintiff without Holman's approval. Holman has also testified that he did not review the personnel files as a matter of course. (Doc. No. 46, Ex. 27 at 22.) Indeed, Holman testified in his deposition that he did not fully review Plaintiff's files until the summer of 2006. (Id. at 25.)

"primary explanations"). Plaintiff has failed to present sufficient evidence to discount the plethora of evidence put forward by HSD of Plaintiff's perceived negligence in the classroom and her lack of professionalism with her peers. Likewise, Plaintiff has failed to present sufficient evidence that would cause a reasonable factfinder to believe that HSD's reliance on the discrepancy in her employment application was unworthy of credence. Although Plaintiff has presented evidence that might allow a reasonable factfinder to draw the inference that HSD knew of her criminal record prior to 2006, such an inference does not cast substantial doubt on the core of HSD's legitimate, non-discriminatory reasons. Therefore, Plaintiff has failed to present evidence "that would allow reasonable minds to conclude that the evidence of pretext is more credible than the employer's justifications . . . ." See Iadimarco v. Runyon, 190 F.3d 151, 166 (3d Cir. 1999). Because Plaintiff has failed to meet her evidentiary burden, her retaliation claim must be dismissed.

## V.     CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment will be granted. An order consistent with this memorandum follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|                                      |   |                              |
|--------------------------------------|---|------------------------------|
|                                      | : |                              |
| **DEBORAH PHILLIS,**                 | : |                              |
| **Plaintiff,**                       | : | **Civil Action No. 1:07-cv-1728** |
|                                      | : |                              |
| **v.**                               | : | **(Chief Judge Kane)**       |
|                                      | : |                              |
| **HARRISBURG SCHOOL DISTRICT,**      | : |                              |
| **et al.,**                          | : |                              |
| **Defendants.**                      | : |                              |

## <u>ORDER</u>

**AND NOW**, this 31st day of March 2010, upon consideration of Defendants' motion for summary judgment (Doc. No. 36), and for the reasons set forth in this Court's memorandum, it is hereby **ORDERED** that the motion for summary judgment is **GRANTED** as to all claims.

S/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania
Dated: March 31, 2010